We can go on. Okay, Mr. Gerkens. Good morning, everyone. I may please report. I'm Fred Gerkens of Councils. Clancy Bingham Goldberg, Co-Leader of the Council for the Sweet Plankton of TKM Sweet Plankton Fruit. Hellas. I'd like to start with the obvious here, that this report does not have the benefits of Telab's opinion. We did brief it, but I would like to go through about four or five points that Telab's Supreme Court makes that I think would have benefited the Supreme Court as well as the plaintiffs here. Do you believe Telab helps you? Yes. And these are the four or five things I would like to explain. The complaint, as the Supreme Court has held, the complaint survives when there are equally compelling emphases for and against the answer. The allegations must be analyzed collectively. And more recently, in Boston Scientific, the First Circuit, there was a fairly recent case, 5.3 F3 75. And in that case, the court held that there are limits to the fraud. Analyzing Telab here, there are limits to the fraud by hindsight doctrine. And in other words, all facts have to be considered here, including those where there's an inconsistent statement, a short time to an inconsistent statement. And as Boston Scientific panel held, motive does not need to be alleged. And the Supreme Court has held that as well as the circuit. But if it is, it should be analyzed to see whether it's consistent with the plaintiff's theory of the case. And finally, and I think as our wider panel has held here, the plaintiffs do not have to plead for a real smoking gun. The district court below found in favor of plaintiffs on several issues. It found that all alleged false statements were indeed false. It found that the confidential witnesses, at least six of them who pledged in the complaint, met the information that was in the pleading requirements standard set by Chuck. And it also found that the Second Amendment complaint did not include a plea. And finally, it also found that the accounting principles involved were not complex. Now, given the above and the errors of this report made in the Santer analysis, the issues presented in this case, I believe, were best framed by Talab's Seventh Circuit on remand. And that is, and I quote, how likely is it that the allegedly false statements that were quoted earlier in the opinion were the result of a merely careless mistake at the management level based on false information fedded from below rather than of an intent to deceive or a reckless indifference to whether the statements were misleading. This report's Seventh Circuit on remand held it as exceedingly unlikely, and we believe that's the case here as well. Now, the district court made several mistakes. They overlooked, it overlooked... The district court is an it. It's an it or a he, but it's not a they. It's an it. Or a he, I'm sorry. It overlooked several facts in the Second Amendment complaint, as well as holding plaintiffs, we believe, to a very strict pleading requirement almost out of the Ninth Circuit. Well, isn't a very strict pleading requirement what is now required in this kind of case? I mean, isn't that effectively what Congress and the Supreme Court have told us? Yes, yes. I believe that is correct, Your Honor, but I think the district court went beyond that and beyond the pleading requirements here. For example, I think the Third Circuit in Atlanta, specifically rejected the Ninth Circuit's pleading requirement because it was concerned about political blindness and reckless indifference, which we have here, at least in regard to the defendant's chief financial officer. Let me ask you one thing that confuses me about this case, is if there were intentional misrepresentation, what were the defendants trying to do? Well, as I've said, the motive is not necessarily necessary. Okay, but is there a motive? Yes. I mean, what's the motive? Well, we think that— To help plaintiffs' lawyers by creating lawsuits? I don't believe that's true, Your Honor. What happened in this particular case was— if we want to go to the motive first here— the company, in its SEC filings, stated repeatedly that it had to diversify. It was just catering to one market. It had essentially one product that accounted for about 60% of the sales. That was the Oxandra? Oxandra, yes. And they were doing this through acquisitions, stock-to-stock acquisitions in the SEC filings. You're talking about Mayellos, the acquisitions? Yes, Mayellos. But the misrepresentations that you are talking about are either two years before or after. No, that's not true. The second set, when we get to January and February of 2001, there's three sets of false misrepresentations that originated, once again, where they certainly had Sienta. And this was a decree contract, $5 million contract. It wiped out most of their earnings when KPMG restated. It went from $7 million to $700,000 in net income for the year 2000. And that decree contract, they specifically issued a press release on that contract. It was much fanfare. And they also stated— What was missing in that press release that you think should have been in it? Well, the press release itself, I don't know what— I don't believe we allege that as being false misleading. What is misleading here is in January and February of 2001, they had said in the June 30th 10-Q, specifically, that they were going to restate for compliance with SAB 101 all licensing contracts for the year 2000. And, of course, the court just latched on to the review prior to June 30th. But it's kind of nonsensical. And to do a review for SAB 101 to comply with SAB 101 for the previous years and not the current year, but putting that aside— I'm still not sure that you told us what was missing or what was false. At the end of the year, what was false was they included $5 million of licensing revenue, and it should have been accounted for. It should have been spread out instead of once. The way they did it was— They didn't know that until they got the second auditor, right? I'm sorry? That came out when the second auditor came in. Well, we believe that we fled Sientra as of the end of the year. I think they knew as of the end of the year because of the review they were conducting and also the size of the contract. Did you allege in the Second Amendment complaint that the individual defendants were accountants or had any expertise in accountants, in accounting? We certainly can take judicial notice of that, Your Honor. We can take judicial notice of that? It's in the record. That they had expertise or training in accounting, we can take judicial notice of that? Defendant Fass, who is the CPO, was with the company since 1983. He was also the treasurer for the company during some period of time. Defendant Sternlich, who was also a CPA, he worked for a cap and a half with a CPA firm, a very large CPA firm. He was with the company since 1993. And I think that he also— I don't think that's responsive to my question. That doesn't mean that either of them had expertise or training in accounting. Well, if he's a CPA— Is there any allegation in the Second Amendment complaint that any of the defendants made any accounting decision with respect to any of the three restated items? I think that's a rhetorical question. Yes. We believe that because— Now, this is where we get into the core business doctrine and also absentee financial management. We don't believe that, in this circuit at least, that management should be able to get off because the chief financial officer spends most of his time in Israel, where his residence is. There's no financial control. The KPMG management letter stated— and this was a material weakness in internal control. They stated that there were no competent or very few competent accounting personnel. You're talking negligence. That's a negligence case. Excuse me. Did you save time for rebuttal? Yes, three minutes. Oh, okay. Go ahead. I was going to ask the same question that Judge Barry just asked. Yes. Well, we believe certainly that we've got sufficient connection between individual defendants and the false attribution to the trends analysis. You keep using the phrase throughout your papers and throughout the Second Amendment complaint, individual defendants. Yes. But aside from paragraph 39, I see almost no mention of any individual defendant by name. They're lumped together throughout. Your Honor, in the press releases, every single one of the alleged false misstatements that we have alleged here, Dr. Fass, defendant Fass, is the one who spoke in every single one of them. The Miles Acquisition, the CUI contract, the SciTech contract, and also the Ross account. And so he spoke at each one of them. So the individual that is put in the complaint, we have that in there. We know who spoke in terms of the press releases. They each signed the SEC filing, but it's making a statement under this president and this court as well as other circuits. And so, therefore, they did make the statement. As I read your position on the first of the representations, maybe first and second are together, you argue that defendants knew or should have known that the sales data was false. I'm sorry? You argue that defendants knew or should have known that the sales data was false. The sales data, yes. But you haven't particularized why. Well, this goes to another error that the district court made. The district court did not look at the additional confidential witnesses that we have in the amended complaint, the second amended complaint. There were two other confidential witnesses. It said defendant Fass was a micromanager. They were in meetings. They all received these reports. The reports were they got from Gentivo, who was the primary distributor and also an outside management report, and they discussed these reports at the meetings. And this court held us to a standard that not only did it discuss these reports at the meetings, but did you really read the reports. And we just could not. The case law is clear that as long as they receive reports, we fled the reports, we explained the reports in the complaint, we were clear to read, and they tell us that... And we have to assume that they read them? The district court was unwilling to assume that they read them. These people get loads of papers. He was discussing the reports in periodic meetings and the other individual defendants were there. And we had confidential witnesses that said that these reports were there when he discussed them. And he overlooked this. What were they discussed for? For purposes of setting commissions? I'm sorry? Purposes of setting commissions? No. It was purposes of reviewing the sales data and the inventory data he had. How do we know that? This was pled by confidential witnesses in the complaint. Okay. Thank you. Your time is up. Thank you. We'll hear from Mr. Warren. May it please the court, your position? Yes. Apparently we have an echo, but we can hear you. May it please the court, Irwin Warren of Wild Gottschall and Manchester Group, PPG, for Mr. Bass, for Mr. Sternlich, and Mr. Bond, to address the court's question. Nothing ties Mr. Bond to anything. He didn't even get hired by this company as the CFO until June of 2001, and I do not see anything in the pleading that could tie him to a Cytec-L sale in 1999, a Dewey sale in 2000, capitalizing expenses for a manufacturing facility in 1999, or a press release even in early 2001. I think Mr. Bond demonstrates why this court's ruling objecting to the pleading made perfect sense, including under the underlying premises of Rule 9b. Judge Ackerman, properly declined to draw inferences of Sienna. I respectfully disagree with my colleague here that Tell Labs helps the plaintiff. Tell Labs does not help the plaintiff at all. I don't think you'll find many plaintiff securities lawyers who think Tell Labs is helpful. Well, I feel compelled to address it. I'm running a bit from my script, Your Honor. But the fact of the matter is, PSLRA, Tell Labs, this court's precedent, says plaintiffs must plead facts, specific facts. What is the alleged misstatement? Which defendant made the misstatement? What was it that created scienter as to that defendant? And then, only then, after pleading facts, may the plaintiff start to see what inferences may reasonably be drawn from the facts. Here, the plaintiff has not pled the facts. I'm going to get into that in some detail. Instead, they've pled some facts, which don't say anything for a cause of action. Ask the court to then infer that there must be other facts, and then ask the court to make an inference of scienter based on the inference of facts. This court, in the Al Parma decision, I hope I understood the case correctly, involved falsified sales, which this case does not. It involved reporting of the falsified sales to the headquarters of the company, which this case does not. It included an allegation that the assistant to one of the defendants got that information, which does not appear here. And even then, this court, if I read the case correctly, declined to infer that that person must have told the individual defendant. In addition, with respect to my colleague in the First Circuit, Boston Scientific, and its approach to pleading scienter is not the law here. And under Weiner, GSC, Key, and Globus, this complaint cannot stand up. Plaintiff's proposed inferences on their face are neither cogent nor compelling. That's the first threshold. But certainly, one could not conclude, looking at the pleadings, the facts, including the public record documents, holistically, as teleethical court says we must do, that a reasonable person would conclude. The Supreme Court was very interesting. It rejected the Seventh Circuit test of whether a reasonable person could conclude that it was fraud. It said, no, would conclude. What's our standard of review? Excuse me? What's our standard of review? Disciplinary, Your Honor. And that's the only reason I'm not giving more deference to Judge Ackerman, who went through this twice and gave them leave to replead. You would think, I think it's a 122-page Second Amendment complaint. There'd be something in there, wouldn't you? Well, you would have thought that. But with all due respect, there isn't, Your Honor. And looked at holistically, especially, which includes scienter, includes motive. And the Supreme Court in Tel Aviv says the absence of pleading of motive is something that goes to the holistic assessment of what would a reasonable person conclude. There's just no there. There. On the question of Exandrin, there is no allegation. This is a fascinating case in some ways, Your Honor. There's no allegation that a nickel of Exandrin sales was misstated or overstated. There's no allegation that one prescription amount was overstated. There's no allegation that any of the Exandrin sales in the fourth quarter of 2000 or the first quarter of 2001 were bogus or anything else. This is a case saying, we didn't correctly state or identify all of the reasons why it went up. We only correctly stated some of them that it went up. Now, number one. But some reasons are better than others. Yes, certainly are. And certainly, stocking up before a price rise is a reason going up that's not going to be reassuring in the future, whereas expanding into a new market is reassuring. Absolutely, Your Honor. And let me address that, because there are several things. Number one, Judge Thornton versus Mike McGrath says we shouldn't check our common sense at the courthouse door. Why would we ever leave out a reason that we knew in the first quarter, only to come out in the second quarter and say, here's the results so far. Sales are going to go down. This is not a company that just laid out the facts in the second quarter and let the market figure it out. It's not like, I think I'm getting it right, the Merck case where the Wall Street Journal had to be subtracting different sales to figure out what the revenue was in billions per volume. That's coming. I'm sorry. Merck case gets argued today. Maybe not the same Merck case. I don't want to step on my colleague's toes. But the point was, why would you ever do that in the first quarter, only to voluntarily say it in the second, the market's going to go down? When did the defendants learn that the increase in those sales in the first quarter and second quarter were due to stocking by wholesalers of the inventories? Well, when they saw in the second quarter that the prescription dosages were lower and that that might account for it, they specifically said, even though the prescriptions are up in the queue, in the second quarter they say, but it's smaller doses. In the third quarter, there was a press release in October in which the press release, which is right out there, the press release specifically said that we have gotten new data, new market research, which indicates the effect on sales and that there was buying in advance of the price increase. So that's in the third quarter. Why would somebody do this? And the why becomes particularly important because motive is a factor. This is one of the few cases I have seen, Your Honor, in which not one defendant sold one share of stock ever. Normally, we get it. Well, how about Mielos? In Mielos, stockholders get scared that this exchange of stock is going to fall apart. No, and in fact, there's a total disconnect in timing, which Judge Ackerman noted. First of all, let me just say, the Dupuy transaction, because that's where we started. The Dupuy transaction, not only was this publicly disclosed, it's got its very own press release. But in the second quarter of 2000, the 10Q specifically says, we have sold it, we have earned the money, we've got the $5 million. Nobody could be misled by that. The accountants, about three years later, may say, no, gee, you shouldn't, even though you had it in the bank. And even though there was nothing else you had to do, you had to spread it out. But this court has stressed that we have an efficient market. This court's opinions have stressed that. Even an inefficient market would understand, we got the $5 million in, we're not getting it over time. We have it. They know it. Nobody's misled. And certainly not in June of 2000. As for Milo's transaction, that doesn't happen until February. But even beyond that, the timing of the releases is clearly set up to avoid anybody influencing the market. For example, the fourth quarter and year-end 2000 results, somebody might say, well, you have a reason to increase that. You want the other side to do the deal. You want to get your stock price up, because you get a better ratio if the stock price is up. The fourth quarter and year-end results for 2000 were not issued until after the Milo's deal was cut. It was not issued until the exchange ratio had been fixed. And most important, the exchange ratio in Milo's was a look-back trailing 20-day average. So if this release came out and the market went up, it wouldn't benefit ETG1 any, because the relevant stock price was the prior 20 days. In addition, you can't even say that, well, they were trying to hype the first quarter earnings to get the Milo shareholders to vote. Now, it's a public record fact that this was a private corporation, so it's not your typical, gee, was the public misled. But even then, public record fact, the Milo's deal was voted on by its shareholders, and it closed on March 19. How do we know this? Because that was stated in April in the press release in which we disclosed the first quarter results. How could we possibly be trying to influence shareholders to vote by putting out a release a month after they voted and the deal closed? There's no relationship, no correlation at all. There also are no facts led with respect to these confidential witnesses. We all believe that, again, by policy. Judge Ackerman did look at the confidential witnesses. I confess I argued to him that he shouldn't look at the confidential witnesses. A salesperson in Seattle who is suing the company for wrongful termination and for not getting a commission on a sale she didn't make is somewhat questionable. It's the reality of the hypothetical confidential witness that the court in Higginbotham is talking about. But put that aside. Put aside that no reasonable person would credit them. When one actually looks at the complaint and what do the confidential witnesses say and not say, it's really interesting. Not one confidential witness says that SimFast ever said, gee, the sales are up because of a price increase. Not one confidential witness says, well, I called SimFast. That's why it went up. They didn't say that they knew that was the reason. Nobody says Mr. Sternlich knew about it. Of course, nobody said Mr. Bond knew about it. He wasn't there. Not one person says, forget whether Mr. Fast said it, not one person said they were present for a conversation in which somebody said to Mr. Fast or Mr. Sternlich, gee, you know, the reason the sales went up is because people are buying in advance of a price increase. Nobody says that either. The documents they put in front of you, these are for purposes of calculating commission. Forget the fact that on their plates they must be documents from 2003 because they include the fourth quarter of 2001. The fact is they may tell you what the sales were, but this is not a case alleging that the sales figures were inflated or wrong. They don't tell you why did a wholesaler buy? How much of what that wholesaler bought was because they thought they were running out of product? How much because they thought there's a new loss market, which is not limited to the Cabot-Lamb loss division, but includes a co-marketer? It doesn't say how much was bought for that. It doesn't say how much was bought, if at all, by any wholesaler, much less all, because of the price increase. The ultimate disclosure was certain wholesalers bought. That was a fact. This doesn't tell you anything. The second document tells you even less. That tells you that the wholesalers were selling to end users. It doesn't even tell you whether the end user was in the loss market or not. What we do know is that in the first half of 2001, prescriptions were up 50% over the prior period the year before. Now, given that my client had the integrity to tell the market, we think our existing market is back in 2000, it's flat, it may even decline, we're going to go into a new market. Where did these new prescriptions come from, if not the new market? Now, later on, we learned they're lower dosage. That is, out in the market, by us, voluntarily, by the second quarter Q. This is much more akin to Weiner, except we at least had prescription information as the basis for seeing a correlation. In Weiner, a CEO, as I understand it, said, well, we bought a new company, we have a facility, it's great, we can walk in. Then a month or two later, he said, well, we can't just walk in, it's going to cost us $8 to $16 million to walk in. Then three weeks after that, he said, well, it's not exactly $8 to $16, it's $11.5 to $16. This court didn't find scienter, this court found that the most reasonable inference, what a reasonable person would conclude, is that as this person got new information, he disclosed it. That is the only, not only is it the most, it is the only reasonable inference here as to why individuals who weren't selling stock, weren't doing an acquisition, putting aside that even doing an acquisition as a matter of law is not enough, because otherwise you would have had a different result than maybe GSC, sorry, Merck, and some of the others. There was nothing. You have a company that's out there telling the market quarter after quarter here's what's going on, and they're not even leaving it to the market to figure out might the sales go down. They say sales will go down. If I may, one last... I think your time is up. I must read my red light. Thank you. I'd like to ask you a question if I can. One of the big things that comes up in your... I'm sorry. One of the big issues in your brief, is that a group pleading? Nobody's mentioned the group pleading issue. The district court found the second time around it was not group pleading. It was not group pleading. It was not group pleading. And so we don't have to worry about that issue. No, I don't. Okay. I would just like to address my colleague. You brought up two, at least two examples here where Telops does assist plaintiffs here, and they're both in accounting situations. One is SciTech, and there was no plausible explanation for why they did not announce the return of this product in 18 months after they allegedly sold it. What are the dates on SciTech? Excuse me? What are the dates on SciTech? June 1999, and they returned it the first quarter of June. I'm sorry, the first quarter of 2001. It was right around there. And what the court did was say, oh, it was conservative in the first press release announcing this deal that it was a one-time shot. Now, if that's the case, then why was there no press release when they returned the product? In fact, they went two steps further and tried to conceal not only through accounting entries that misrepresented in the SEC filings why cost of sales had went up. They attributed the cost of sales increase, which really, because of the return of SciTech, was something completely different. And the second one, this is where we have two compelling instances, and I think the plaintiffs should prevail here, and that is the other example my colleague said here about the SAB, about the CUI contract in June of 2000, in that particular instance, my colleague states that they disclosed everything. Now, he also fails to tell you that in the June 10 Q, they tell you that they're doing the SAB 101 review. That's on the market, so everyone knows it's on the market. They got the $5 million fee in, and they tell you they're going to restate this if there's a problem with it. So the implication is to the market, the implication to the market is there was no problem with reporting the $5 million fee the way it was reported. So, and you got two compelling instances there, two facts, and the compelling, and I think the plaintiffs win on that particular matter. I mean, under Tell Labs, I find these remote facts where none of the defendants have sold stock, where the only motive you seem to tell us about is the acquisition of Milo's. I am certainly unpersuaded. Well, Tell Labs does say you don't have to plead motive, and I can tell you right now as a CPA myself. But we also have to use a little common sense in thinking about what are these people doing and why are they doing it. Why could they be doing it? Well, Rothman, the Second Circuit case, has imputed motive to individual defendants from an acquisition. They did not have to sell stocks, and Tell Labs says in this circuit, But you invoke the Milo's acquisition as a theory of motive. You invoke the Milo's acquisition as your theory of motive, as a theory of motive. And now you're saying it's not... I'm saying it's not necessary. I think you've played enough without it. But I find that you've got, again, the statements by Defendant Bass concerning reason for the spike in the increase of Oxidrin in the first quarter and the cover-up of the SciTech return and also the lack of a restatement of the pre-contract all suspect because they all came around. And this is the second set of misstatements. I'm not taking note of the first set. Are you withdrawing from the Milo's acquisition? Yes, I mean, it just comes down to cutting the class barrier. You only need to say one mistake, and that's Bogey v. Krupp in the Library of Sixth Circuit. Thank you very much.